Good morning, Your Honors. May it please the Court. My name is Catherine Alfieri, and I represent the appellant, Charles Edward Lepp, and I'd like to reserve three minutes, if I could, in rebuttal, Your Honor. Okay. The matter on appeal this morning I'd like to address is appellant's contention that the district court's refusal to permit him to present a religious defense at trial violated the Religious Freedom Restoration Act, RFRA, and his right to present a defense and a host of other constitutional rights that are articulated in the briefs. In its order, the district court undertook the requisite RFRA analysis and correctly determined that the defendant had made a prima facie showing that the CSA, the Controlled Substances Act, burdened his religious exercise and determined that he was a Rastafarian with sincerely held religious beliefs, and then made a critical determination that should have informed the rest of the analysis and didn't quite. And that was the novel and unique determination that the tenets of Rastafarianism require not only, excuse me, the possession and consumption of marijuana, but also require adherents to manufacture, cultivate, harvest, process, distribute marijuana to other adherents, as well as permit other adherents to utilize one's own marijuana for sacramental usage. Now, in our view, the district court's analysis then went off the rails by determining that the sheer quantity of marijuana, which was almost 25,000 plants in this case, made the potential for diversion of that mass quantity of marijuana to nonadherents very high, and that the government had a compelling interest in thwarting that mass diversion of marijuana to nonadherents, and that the enforcement of the CSA was the The district court's diversion determination, which was a sua sponte determination, an issue that the government did not raise at trial and that the court on her own utilized in the order, is unsupportable and errant because it rests on three interrelated findings that are factually and legally insupportable. The first is the court's finding that the sheer quantity of marijuana made the diversion potential to nonadherents very high. And we should make no mistake about it. This entire case is about quantity. Throughout the proceedings, the court made comments on the record that don't necessarily appear in the order, but the court made comments that the amount of marijuana was wholly disproportionate to any sacramental use. And that informed its diversion analysis. It is appellant's position that Is it theoretically a wrong analysis? In other words, let's suppose that one, this isn't this case, but at least not specifically. Let's suppose that one's religion required every adherent to ingest one peyote button per year, but the defendant possesses 19,000 of them and there are only, you know, 400 known adherents. Isn't there some relevance to quantity in determining what – whether the defense applies? Absolutely, Your Honor. And I – the argument is not that quantity is not relevant. The argument as the sheer quantity alone cannot sustain a diversion finding because this religion specifically requires adherents to manufacture and distribute marijuana. And so the operative inquiry is not only on the number of plants and the amount of marijuana, but also upon the number of adherents. And it's our position that in the context of a religious practice that requires adherents to manufacture and distribute marijuana, the amount of marijuana without more cannot sustain a diversion finding. And again, that operative inquiry is on the number of adherents as well as the amount of the substance subject to the CSA. Unfortunately, in this case, that was an inquiry that the district court errantly undertook. What's also interesting is that the district court recognized that there was this interdependent relationship between the number of adherents and the number of plants, because she rendered a second errant determination by finding that Reverend Lepp had made no showing that the size of his congregation warranted the amount of marijuana. Now, the record below conclusively proves otherwise. The government does not even make an argument to try to sustain the district court's judgment on this basis. There were declarations from church members, there were declarations from Mr. Lepp, there were transcripts, there were pleadings demonstrating that at the time of the 2004 search warrant, Mr. Lepp's congregation exceeded 2,500 members, and that there was a parcel of rural land that was across from the ministry that was a separate 20 acres that was a church garden that was divided into plots upon which members were permitted to grow their own marijuana as sacraments. And what's interesting as well is that it's not that the defendant didn't make the showing. It's rather that the district court disbelieved that evidence, that there were 2,500 members and that this was a church garden, and in so doing rendered a third interdependent errant factual and legal finding, and she found that the defendant's rougher defense in general and the specific evidence that his congregation numbered 2,500 and that church garden was cut into plots upon which members grew their own marijuana were recent opportunistic fabrications, and that the court would not consider that evidence. The record below conclusively disproves that evidence. And the evidence in that record is some of the government's own evidence that they submitted to try to sustain their facially deficient search warrant, which was ultimately quashed in this case. And that is the DE agent McConga has stated during the search, Reverend Lepp told him, that's a church garden, there's plots, that's members, I don't have any interest in it. It's all in the record. So the court's finding that these were recent opportunistic fabrication is not borne out by the records in terms of as far back as 2004 into 2006 into pleadings and transcripts. So it is our position that the district court's diversion finding is legally and factually unsupportable because, again, in the context of a religious practice that requires adherence to manufacture and distribute marijuana, the sheer quantity of marijuana alone cannot sustain a diversion finding because the amount of marijuana must be gauged in light of the number of adherents. That is, there must be a finding as to whether the size of the adherents' congregation warrants the quantity. The district court errantly determined that the defendant didn't show that the size of his congregation warranted that amount of marijuana by errantly refusing to consider evidence that was in the record four years prior to the time she made her determination, by errantly deeming that evidence recent opportunistic fabrication. Sotomayor, are you saying that the potential that all of the marijuana on the rural property could be used by the adherents means that a diversion theory could not also be logical? In other words, there are 25,000 plants of marijuana across from a public highway, public road. Correct. So that marijuana could be diverted away from 2,500 members, whether they ultimately might use it for personal consumption or not. Well, I think that that raises another issue. But for purposes of this argument, what I'm saying is that you can't decide it's an excessive amount of marijuana without knowing how many adherents there are. And the diversion concern is not just that it's a willy-nilly diversion to anyone, but that it's a diversion to nonadherents. And so there is the sense underlying the order is the concern that this marijuana be sacramentally used. And so the first question that has to be answered is whether this marijuana could be sacramentally utilized, could be sacramentally utilized by the size of this congregation. Now, the government points to a second portion of the district court's order where it notes that there was this open possession and that the this rural field, that anyone could just walk on to this rural field as law enforcement had, and that this open, this open possession and this open growing exacerbated the chance of diversion of marijuana to nonadherents. But I want to keep saying that the compelling government interest here is in thwarting the diversion of marijuana to nonadherents. And so in this context, I would suggest that the district court did find that the open and lack of barrier exacerbated the potential for diversion. Roberts. I wonder if you would talk a little bit about the Messiah issue, please. Yes. Specifically, my concern is why was it an error for Judge Patel to have allowed the evidence of the 2005 sale to be used to impeach the defendant? Okay. Give me a second, Your Honor. I'm one-handed right now. Sure. Well, I think the Court one of the problems with the first of all, it's well settled that in order to admit Messiah violative statements, the district court must find that the statements are inconsistent with the defendant's testimony and that they must not be collateral. And it's our position that this sale was both not inconsistent with Mr. Leff's testimony and was collateral. Let me ask you specifically, at excerpts volume 2, starting at page 293, I interpret your client's testimony to mean that ever since the year 2000, he has had a practice of allowing other people to grow marijuana on his property, but he has no interest in it. He had no role. It's not his stuff. And annually, he sends kind of notices to the government to this effect. Why isn't the testimony of a sale in 2005 contradictory to his claim that in the years since 2000, he's had no interest in this substance? Okay. So first, I would say that there was no specific testimony that he did not testify and was not asked the question, have you ever sold marijuana? So there's no specific. And what the Court So it's your position that it has to be How specific is specific? So if he says I've never owned it, but then they prove that he's sold it, why isn't that inconsistent? Well, that's that, and that goes to the second question, and is that Mr. Leff's testimony was specifically oriented to August 2004, was specifically oriented to the rural property across from his residential property. And one of the problems, I think, throughout the proceedings is this conflation of the two different parcels. There is a parcel that is that is that there are actually four parcels. There's two parcels that are the residential property that I think comprise four to six acres. On that parcel, there were 7,000 plants found, 1.6 kilos of marijuana. There were packaging. There was a variety of things found on the residential parcel which housed the ministry and a variety of buildings, including a ministry building and a residence. Across the highway was a 20-acre parcel, also two parcels, but called the rural property, and that is the property that Mr. Leff attested was solely a church garden. And the 24,000 plants at issue did not come from the residential property, but solely came from that rural property. And so it is our position that in that 2004 search warrant, the residential marijuana, the 7,000 plants, the 1.6 kilograms, that was all suppressed. The 24,000 plants on the rural property was admitted despite the facially deficient search warrant on an open fields theory. It is our position that Mr. Leff did not disavow the marijuana from the residential property. He solely disavowed the marijuana from the rural property. Roberts. I see you're down to two minutes. Yes. I mean, I'm happy to continue discussing this with the Court, but I would just like to note that the Mr. Leff did not disavow the residential property marijuana, and he did not ascribe all the marijuana on all of his property to the church, solely the marijuana on the rural parcel. Thank you, Your Honor. Thank you, Zophira. I would like you to start there, if you would, with that particular issue. The Messiah issue, Your Honor? Because his testimony does seem to be all about the 2004 charges and all about the rural property. If he doesn't testify generally about his involvement in the marijuana trade, including sales from his residence, how does the testimony with respect to the 2005 sale come in without violating Messiah? Well, it did come in as impeachment by contradiction. And for the section that Judge Graber pointed to, while defense counsel tried to cabin it to August 2004, excerpt of Record 294, the question is asked, did you inform anybody else other than church members of your plans? And two questions earlier, defense counsel, as I said, cabinet by saying August 2004. Defendant gives a paragraph answer. And in that paragraph answer, he opens it up. He says, we notified the Board of Supervisors. And then he sets forth the others and says, the last two years, we sent out little notifications. And we notified them that we were growing marijuana for medicinal and sacramental purposes. Well, that's directly contradicted by the 2005 sale. He goes on in his paragraph answer to say, and all of those letters were sent out every year since the year 2000. He's testifying, Your Honor, on August 7, 2008. He's talking in his answer that we sent out letters. And he says, the last two years, we sent out little notifications. So the letter he's sending out covered the 2005 sale, and for that reason is expanded beyond the August 2004 seizure that his counsel is trying to limit. Well, I'm not following that. Up at the top of page 294, he's talking about the lower portion of the land, which I assume is the rural property. Yes. So where is it that you say he diverts his testimony more generally? Well, he answers and says, the last two years, so we're now into 2006 as far as time frame. Defense talked about that the time frame was cabbed into 2004. And he says, we were growing at this location, we were growing marijuana for medicinal and sacramental purposes. He references the letters. In rebuttal, defense counsel actually introduces one of those letters. And that is at excuse me, in Defendant's Redirected Excerpt of Record 337, Your Honor. Defense counsel says, now, Eddie, you mentioned this decision to open up the field. Did you contact law enforcement? And at the bottom of 337, and this is Defendant's excerpts, he says, we contacted them every year since the year 2000 by certified mail and sent them a letter giving them an exact address, all the exact parcel numbers, and told them exactly what we were doing in detail. Well, he didn't tell them exactly what they were doing in detail because he had this sale of marijuana. And the letter is then argued in closing at the government's supplemental excerpt of record 669. And in that letter that was introduced as government, or excuse me, as a defense exhibit, it doesn't break it out into rural property and residential property. It talks about growing marijuana for religious and medicinal purposes. But there isn't this clear-cut breakdown that defense would have you believe. It was with regard to all the growing of marijuana. And for that reason, it was a specific statement about a matter intent that went to the heart of the case, defendant's intent and conspiracy to possess with intent to distribute. And for that reason, the district court found the door had been opened to impeach by contradiction because defendant's testimony was inconsistent. What's the exhibit number that you've got in your hand? What I'm looking at is supplemental excerpt of record 669 in which defense counsel argues the letter, which is defense exhibit B. Unfortunately, neither party put that exhibit into the record. I have the exhibit. I can file a supplemental 28J letter. But that the letter is actually, the text of it is contained in defense's closing argument at SCR 669. Sotomayor, let me ask this question generally, and then you can move on to something else. If we conclude that Mr. Lepp's testimony in direct is all about the rural property, if we conclude that, that's contrary to your argument, but if we conclude that, does this testimony legitimately come in? I still think it does, Your Honor, because as the court found, it's inconsistent. He didn't break up, well, I was using the rural property for one purpose and I was selling drugs out of my home, residential, for another purpose. I still think it does come in because I still think it's inconsistent with regard to his testimony. And the court made that specific finding. She notes that at excerpt of record 315, if certain things are said, and she found certain things were said, that this opened the door because it left a false impression. And that's the very purpose of the exception established in Kincaid-Chauncey, is that a defendant cannot engage in perjury and get away with it because there's a prohibition against collateral testimony coming in. If the Court doesn't have any other questions on the Maasai issue, I'll work backwards to the religious issue in this case. First, this Court has repeatedly held that the Religious Freedom Restoration Act does not permit the unlimited production and distribution of marijuana, that the government has a compelling interest in preventing that. Second, in this case, and this is something I should have more clearly articulated in my brief, the statute, RFRA, only protects religious use. By defendant's own admissions, repeatedly, he claims he was also growing this marijuana, conspiring to possess this marijuana with the intent to distribute for medical marijuana purposes. That is not covered by the Act. There is no exemption. Indeed, as the Supreme Court made clear in Gonzales v. Raich, it is a violation of Federal law to possess or use marijuana even with a State sanctioned prescription. And because of that, that's the end of the argument, because the least restrictive means of preventing the defersion to non-Rastafarians of these 25,000 plants was to criminalize it, because defendant is admitting this wholesale diversion to medical marijuana users. And the Court did a careful analysis in its order at Excerpt of Record 61 where it talked about there is this compelling interest, found defendant was sincere, but what was the least restrictive means, and took a look at the permit proposal in the Antwon case that was cited by defendant, and that was a statutory scheme that prohibited the possession of bald and golden eagles, but included a permit process for an exception for religious purposes. And Judge Patel looked at that, and she cited a D.C. case, Olson, in which defendant had proposed a permit process for marijuana and found that it was extremely burdensome because of the constant need for supervision and management, and found in this case, and based on, as I said, the medical marijuana issue, there was wholesale diversion. And the Court's conclusion was that RFRA and the purposes of RFRA are not violated in this case. If anything, in fact, I think it would do violence to RFRA to hold otherwise. And the facts uphold that conclusion. If there are any other questions, I'm happy to address them. Otherwise, I would submit. And I'd request that the Court affirm the defendant's sentence and his conviction in this case. Thank you very much. Thank you, Ms. Gray. Ms. Alfieri. First, I think that Ms. Gray is mistaken about this question of the letters. These letters were sent out annually. The record reflects from 2000 to 2004. The last letter was sent out in January of 2004. It's the 2004 letter wherein Mr. Lepp and the congregation let the public officials know that he is opening that particular field to members of his church to grow medical marijuana. The prior letters were to the Lake County various law enforcement agencies and the AG and whatnot, but that concerned the residential parcel. The only letter that comes out about the rural parcel is the 2004 letter. And there is no further letters, because in August of 2004, there is the search on Mr. Lepp's property and all of the marijuana is eradicated. So there are no further letters after 2004. The second question of diversion to medicinal marijuana users is truly not borne out by the record. In this case, the evidence is crystal clear that in order to participate in the church garden, one had to be a sincerely practicing Rastafarian. Except at page 293, which is the page we've been talking about, your client says, my wife and I decided through the ministry to open up the field to medical marijuana patients and members of the church. Correct. And all of the evidence, that's in the trial transcript, absolutely, and it's a little – it's not as clear. However, there are declarations submitted with the motion in limine requesting permission to adduce a religious defense, wherein it is crystal clear that in order to participate in the church garden, one had to be a sincerely practicing Rastafarian as well as have a valid California medical marijuana card, and that it was a dual requirement and that Mr. Lepp had a very rigorous vetting process and that not everyone who attempted to grow marijuana in that field was permitted to. But this kind of – That's a very curious – well, your time is up. It just seems curious to me that if it's truly a religious belief that every Rastafarian should be able to grow and produce and use marijuana, why they would also have to have a medical need for it? Well, I think it was, you know, it was his church's determination to limit it further beyond just Rastafarians, but to Rastafarians who had valid California medical marijuana cards. And the evidence below clearly, clearly indicates that. And in fact, the government makes the argument in their brief that, you know, the sting sale is relevant because Mr. Lepp didn't ask the agents as to whether they were medical marijuana users or Rastafarians. It's crystal clear throughout the record that that's a dual requirement and that Mr. Lepp chose to limit his marijuana church garden, his Rastafarian garden, to those members of the community who were valid medical marijuana users. Thank you, Ms. O'Farrill. Thank you, Ms. Gray. The case just argued is submitted. Thank you. Thank you, Your Honor. We noticed you sent in a notice about possibly having to postpone the argument because you were sure you were glad to see you back in business. Yes. Yes. I'm back with the Yankees next week. Good luck with that. No, not good luck with that. We'll have a different view on that question on the panel, I guess, about teams. We'll talk teams later.
judges: Silverman, Graber, Cjj Lynn (N. Texas), Dj